DAYTON BAR ASSOCIATION *v.* GERREN.

[Cite as *Dayton Bar Assn. v. Gerren,*
103 Ohio St.3d 21, 2004-Ohio-4110.]

(No. 2004–0496—Submitted April 27, 2004—Decided August 18, 2004.)

**Per Curiam.**

{¶ 1} Respondent, Nicholas L. Gerren Jr. of Dayton Ohio, Attorney Registration No. 0032341, was admitted to the practice of law in Ohio in 1973. On February 10, 2003, relator, Dayton Bar Association, charged respondent with having violated DR 7–101(A)(3) (prohibiting an attorney from intentionally damaging or prejudicing a client) and 9–102(B)(3) (requiring an attorney to keep complete records of client's property in the attorney's possession), among other Disciplinary Rules. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and, based on the parties' stipulations and other evidence, made findings of fact, conclusions of law, and a recommendation, all of which were adopted by the board.

## Misconduct

{¶ 2} Before the panel, the parties agreed that respondent had violated DR 7–10l(A)(3) and 9–102(B)(3) and asked that the other allegations of misconduct be dismissed. The parties also stipulated to the events underlying the admitted infractions.

{¶ 3} Beginning in 1996, respondent represented a client in a personal injury claim arising from a motorcycle accident. Respondent settled the client's claim, without having to file suit, for the $50,000 limit of the tortfeasor's insurance policy. After deducting his one-third contingent fee, respondent deposited the remaining settlement proceeds in his trust account. Respondent later issued check payments to all but one provider of his client's medical care. He then also paid his client the settlement proceeds to which the client was entitled.

{¶ 4} The unpaid provider—the Franciscan Medical Center—had billed respondent's client for $12,159.64 in inpatient and outpatient services. Respondent offered to attempt to reduce this amount by negotiating a compromise, and his

client agreed. The client also agreed that if respondent's negotiations were successful, they would divide the resulting savings, with one third of the proceeds going to respondent and two thirds going to the client.

{¶ 5} Respondent contacted Franciscan Medical Center and negotiated with a representative to within $200 of a deal. The negotiations eventually stalled, however, because the medical center had financial difficulties and respondent lost track of his contact. At about the same time, respondent began to face a series of overwhelming personal problems. He went through a divorce, and his father became seriously ill. Respondent's practice, which had never been particularly lucrative, suffered due to these incidents and other factors. And after respondent became involved in a complaint against the Montgomery County Public Defender, his professional stature in the community suffered as well. Respondent also unsuccessfully ran for the Ohio General Assembly, essentially closing his practice during his campaign.

{¶ 6} During these events, respondent made a series of disbursements from his trust account and used the funds to pay his personal expenses, all the while realizing the impropriety of his actions. Respondent eventually exhausted the money that he had reserved to satisfy his client's debt to the Franciscan Medical Center.

{¶ 7} Several years passed before Megacity Collections, a debt collection agency that had taken over the Franciscan Medical Center's accounts receivable, contacted respondent. Having by that time spent the money that was to pay his client's last medical bill, respondent accepted responsibility for payment and began negotiating with Megacity on his own behalf. Respondent had some difficulty pinning the collection agency down as to the precise amount of the debt, but he nevertheless made at least two $500 payments to satisfy the arrearage.

{¶ 8} In time, however, respondent's financial situation caused him to miss some payments, and the collection agency obtained a judgment against his client for the balance of the debt. When respondent learned of this development, he contacted Megacity Collections in an effort to settle the account with them. Megacity Collections then reported respondent's transgressions to relator. Respondent has since obtained a loan and attempted to pay the collection agency $11,059 to retire the debt and satisfy the judgment against his client. As of the hearing date, however, respondent had not been able to finally resolve the matter.

{¶ 9} Based on these facts, the board found that respondent had violated DR 7–101(A)(3) and 9–102(B)(3), as stipulated. Recognizing that neither it nor the panel was constrained to find only the misconduct stipulated by the parties, see Section 1(A) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline

("BCGD Proc.Reg."), the board nevertheless dismissed all other allegations of misconduct.

## Sanction

{¶ 10} Respondent candidly acknowledged that he was wrong to withdraw for his own use settlement funds that had been set aside to pay his client's last medical bill, and the board considered this admission a mitigating feature of respondent's case. See BCGD Proc.Reg. 10(B)(1)(g). The board also found that prior to having committed this ethical infraction, respondent had had an impeccable legal career dedicated to providing legal services for the less fortunate and highlighted by significant community service. Respondent further accepted responsibility to repay the money he had misappropriated and did so notwithstanding the outcome of the disciplinary proceedings. And in his testimony at the hearing, respondent apologized and expressed genuine remorse for his behavior and the embarrassment he had caused the legal profession, impressing the panel and board with his sincerity. In fact, relator's counsel was convinced that the mitigating factors in this case warranted the imposition of a less severe sanction than was usual in similar cases.

{¶ 11} Beyond this, the board found that although respondent's client has not so far complained of financial repercussions from respondent's transgressions, the judgment entered against the client might easily have had significant adverse effects. And despite respondent's remorse, his character and standing in the community, and the dismissal of other charges of misconduct, including a violation of DR 1–102(A)(4) (barring an attorney from dishonesty, fraud, deceit, or misrepresentation), respondent's infractions constituted serious misconduct. The misappropriation of a client's funds can be cause for disbarment, see *Cleveland Bar Assn. v. Dixon* (2002), 95 Ohio St.3d 490, 769 N.E.2d 816, and even without dishonesty or deceit, misappropriation of client's money can warrant the indefinite suspension of an attorney's license. *Dayton Bar Assn. v. Green,* 97 Ohio St.3d 119, 2002-Ohio-5314, 776 N.E.2d 1060. An exception may be made, however, when the misappropriation represents an isolated incident in an otherwise unblemished career. *Toledo Bar Assn. v. Kramer* (2000), 89 Ohio St.3d 321, 323, 731 N.E.2d 643.

{¶ 12} Adopting the panel's recommendation, the board agreed that respondent's misconduct fell under the isolated-incident exception and did not require an actual suspension. As evidence of this, the board cited respondent's full cooperation in the disciplinary proceedings, his expressions of contrition and remorse, his philanthropic works for the indigent, a reference's praise of respondent's character, and relator's commitment to the imposition of a conditionally stayed suspension period. The board thus recommended, consistent with the panel's report, that respondent's license to practice law be suspended for a period

of six months, with the entire suspension to be stayed and respondent placed on probation under the conditions that (1) he complete 12 hours of continuing legal education consisting of course work on law office management and (2) he commit no violations of the Code of Professional Responsibility during the term of the suspension and probationary period.

{¶ 13} Upon review, we agree that respondent violated DR 7–101(A)(3) and 9–102(B)(3), as found by the board. A stayed suspension of respondent's license, however, is not appropriate under these circumstances.

{¶ 14} Misappropriation of a client's money cannot be tolerated, and it is immaterial whether the amount at stake is large or small, to be paid to the client, or applied to pay a client's debt. The presumptive disciplinary measure for acts of misappropriation is disbarment, *Disciplinary Counsel v. France,* 97 Ohio St.3d 240, 2002-Ohio-5945, 778 N.E.2d 573, ¶ 11, although this sanction may be tempered with sufficient evidence of mitigating or extenuating circumstances, including the isolated-incident exception cited by the board. *Disciplinary Counsel v. Smith,* 101 Ohio St.3d 27, 2003-Ohio-6623, 800 N.E.2d 1129.

{¶ 15} As noted, we relied on the isolated-incident exception in *Kramer,* 89 Ohio St.3d 321, 731 N.E.2d 643, to conditionally stay a six-month suspension of an attorney who withdrew for his personal use over $3,000 that he should have applied for a client's medical expenses. The misconduct committed in *Kramer* is thus similar to this case and also involved several strong mitigating considerations. But at least in *Kramer,* the attorney replaced the client's money in his trust account and paid the client's medical bills within six months. Here, respondent spent the medical-expense money over a period of years, and his misappropriation ultimately resulted in a judgment against his client that apparently has not been satisfied.

{¶ 16} Thus, while respondent has done what he can to ameliorate his wrongdoing, we find that his misconduct is more egregious than in *Kramer* and warrants a more serious sanction. Respondent is, therefore, suspended from the practice of law in Ohio for six months. Costs are taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., RESNICK, F.E. SWEENEY, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

PFEIFER, J., dissents and would suspend respondent for six months, stayed.

---

David J. Fierst, for relator.

Lane, Alton & Horst, L.L.C., and Alvin E. Mathews Jr., for respondent.